David A. YOUNG, Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 73–1621.

United States Court of Appeals,
Fifth Circuit.

Aug. 15, 1974.

Bruce Baldwin, Burleson, Bondies, Baldwin & Pate, Dallas, Tex., for plaintiff-appellant.

Frank D. McCown, Fort Worth, Tex., Roger J. Allen, Asst. U. S. Atty., Dallas, Tex., Thomas W. Petersen, Court of Claims Sec., Civ. Div. U. S. Dept. of Justice, Washington, D. C., for defendant-appellee.

Before WISDOM, AINSWORTH and GEE, Circuit Judges.

WISDOM, Circuit Judge:

In this suit, David A. Young, the plaintiff-appellant, sought judicial review of the action of the Army and Air Force Exchange Service, a non-appropriated fund instrumentality of the United States,[1] separating (discharging) him from his position with the Exchange Service as architect. The district court dismissed the complaint on grounds discussed below. We reverse in part, and hold that the plaintiff is entitled to judicial review under the Administrative Procedure Act.

I.

*The Complaint.*

Young brought this action against the United States on September 24, 1971. On December 22, 1972, he filed his third amended complaint, consisting of five counts. Jurisdiction over the first count was grounded on the Tucker Act, 28 U.S.C. § 1346(a)(2) and 31 U.S.C. § 724a. Young alleged that on November 17, 1966, he was employed by the Army and Air Force Exchange Service "to perform general duties as an architect". More specifically, he asserted: "Plaintiff had no fixed tenure of service, no fixed emolument, and no fixed duties to perform. He was responsible for such duties as the Exchange Service assigned to him, held his job at the will

1. The 1969 Senate report accompanying the proposed amendments to the Tucker Act, discussed below, noted of the instrumentality involved in the present suit: "The Armed Forces post exchange system—a prime example of a nonappropriated fund activity—is now the third largest department store chain with annual sales of over $4.5 billion, exceeded only Sears, Roebuck & Co. and J. C. Penney Co." S.Rep.No.268 on S. 980, 91st Cong., 1st Sess. (1969), at 3. There is no statute specifically authorizing or appropriating funds for the Exchange Service, though, as noted below, Congress has on several occasions enacted legislation which makes Exchange Service employees subject to some of the provisions of the statutory scheme which embraces federal employees generally and excepting them from the scope of others. In Standard Oil Co. of Califor-

nia v. Johnson, 1942, 316 U.S. 481, 483–484, 62 S.Ct. 1168, 1169, 86 L.Ed. 1611, 1615, Mr. Justice Black analyzed the legal foundation of the Exchange Service as follows:

On July 25, 1895, the Secretary of War, under authority of Congressional enactments [16 Stat. 315 (1870) ; 18 Stat. 337 (1875)], promulgated regulations providing for the establishment of post exchanges. These regulations have since been amended from time to time and the exchange has become a regular feature of Army posts. That the establishment and control of post exchanges have been in accordance with regulations rather than specific statutory directions does not alter their status, for authorized War Department regulations have the force of law. [Citations omitted.]

of the Exchange Service and discharged only such duties as the Exchange Service assigned him. He had no supervisory authority and all his work was reviewed by higher authority for approval or rejection prior to implementation." The plaintiff was discharged from this employment on or about May 15, 1970.[2]

The first count argues that the alleged "acts and omissions" of the Exchange Service constituted a breach of the "express or implied contract" of employment which the plaintiff and the defendant entered into when the plaintiff joined the Exchange Service. Count one characterized the terms of this "express or implied contract" as follows:

"[I]n exchange for plaintiff's services as an architect, defendant would act in substantial compliance with the

2. The first count narrates the events allegedly leading to the discharge as follows:

Approximately a year earlier, in May 1969, plaintiff was rated by the Exchange Service on a personnel efficiency report, which rating plaintiff believes was in error. On or about June 11, 1969, plaintiff did offer a written defense to such efficiency report. Thereafter, the Exchange Service did begin a calculated plan of annoyance and harassment of plaintiff, all designed to force plaintiff's resignation. During such period plaintiff did make various appeals to higher authority within the Exchange Service, all without avail. Subsequently, separation proceedings by the Exchange Service against plaintiff were begun which culminated in plaintiff's discharge on May 15, 1970. Thereafter, a formal grievance hearing was held in July and August, 1970. Such grievance hearing ruling was adverse to plaintiff and plaintiff's discharge from the Exchange Service was upheld. . . .

. . . [D]uring all of the foregoing, defendant [the United States], acting through its instrumentality and/or agency, the Exchange Service, did commit certain acts and omissions as follows:

(a) Did discharge plaintiff because plaintiff offered a defense to an adverse personnel efficiency report.

(b) That prior to such discharge, defendant did transfer plaintiff to another department to give the "appearance" of impartiality when, in truth and in fact, such transfer was a subterfuge to gather additional false data to support the wrongful discharge of plaintiff.

(c) Did prepare three false personnel efficiency reports.

(d) Did abuse plaintiff with cursing and obscenities in various attempts to frighten plaintiff into resigning from the Army and Air Force Exchange Service.

(e) That plaintiff's immediate supervisors did demean, belittle and insult plaintiff's professional reputation and abilities, and did attempt to force plaintiff to do harm to the interest of defendant which plaintiff refused to do, thereby provoking such demeaning, belittling and insulting supervision of plaintiff's work.

(f) That prior to such grievance hearing, the defendant did give the "illusion" of a fair and impartial review of the grievances of plaintiff when, in truth and in fact, all such illusory reviews were subterfuges designed to expedite the discharge of plaintiff without regard to fairness, honesty or fair play.

(g) That at such grievance hearing, unknown to the plaintiff, the members thereof should have disqualified themselves and refused to sit in judgment on plaintiff for the following reasons, to-wit:

(i) One member of the grievance committee . . . had a similar grievance pending against him immediately before or during plaintiff's grievance hearing;

(ii) Counsel for the Army and Air Force Exchange Service at such grievance hearing did have private communications with the full grievance committee after the evidence closed; and

(iii) During such grievance hearing, the defendant's chief witness, Mr. O'Connor, the chief of the section in which plaintiff worked, was given an award and a check for a certain sum of money for outstanding performance by the Commanding General of the Army and Air Force Exchange Service. Key members of the section in which plaintiff worked, including actual and potential witnesses for the plaintiff, were called into the Commanding General's office to be present at such presentation to Mr. O'Connor, which was designed to impress and intimidate such actual and potential witnesses for the plaintiff with the futility of plaintiff's grievances while plaintiff's grievance hearing was actually in progress.

(h) That prior to such grievance hearing, defendant did fail to counsel with plaintiff prior to taking any adverse action [as required by the Army and Air Force Regulations then in force applicable to Exchange Service employees].

(i) That defendant did fail to apply the Veteran's Preference Act to plaintiff's various appeals in this action.

laws and the rules and regulations defendant did promulgate from time to time and regulate the relationship between its instrumentality and/or agency, to-wit: the Exchange Service, with the employees of such Exchange Service, including plaintiff herein."

Count one sought reinstatement to the position plaintiff held before discharge and damages, "measured by plaintiff's annual salary with defendant," of an amount "not to exceed at least $10,000".

The second count sought to establish jurisdiction under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and 28 U.S.C. § 2671 et seq., and alleged the same factual basis as the first. It sought damages of "at least $20,000, which damages are continuing and measured by plaintiff's annual salary".

The third, fourth, and fifth counts, predicated on the same factual basis, sought to invoke jurisdiction under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. Count three alleged that the discharge was "arbitrary, capricious and an abuse of discretion, without observance of procedure required by law, and unsupported by substantial evidence". Count four asserted a denial of due process under the Fourteenth Amendment of the United States Constitution, but made no mention of the Fifth Amendment. (The dismissal of this count has not been urged as error in this appeal.) Count five alleged, in addition, that:

"[P]laintiff [as a veteran] was a preference eligible employee within the meaning of 5 U.S.C. § 7512; by reason of such status, plaintiff could be discharged only for such cause as would promote the efficiency of the service. That such status of plaintiff was such a property right held by plaintiff in his continued employment as to entitle him to the due process guarantees of the Fifth Amendment to the United States Constitution.

. . . . That contrary to such guarantees, as aforesaid, plaintiff was denied due process of law in that he was discharged without being allowed a full evidentiary hearing prior to termination[3] he was denied the right to a list of specific charges against him; he was denied the right to be heard by an impartial hearing officer, but on the contrary, the same agency official that initiated the action against plaintiff did make the decision to remove plaintiff pending plaintiff's formal grievance hearing; plaintiff was denied the right to confront and cross-examine adverse witnesses, and plaintiff was denied a written decision indicating the reasons for his discharge and the evidence relied thereupon; all such denials being made by defendant prior to plaintiff's formal grievance hearing on his discharge."

Included in the record and relevant to the first count is an affidavit of the plaintiff which states, in pertinent part:

"[W]hen plaintiff first became employed by the Army and Air Force Exchange Service, he was forwarded a letter offering him employment as an architect and he replied to such offer by a letter of acceptance sent to the Army and Air Force Exchange Service. Further, all reference checks were satisfactory and deponent completed his probationary period."

On motion of the United States, the district court entered an order dismissing the action on the grounds (a) that the plaintiff's employment relationship with the Exchange Service did not constitute a contractual relationship that could give rise to an action under the Tucker Act, 28 U.S.C. § 1346(a)(2), (b), that the action could not be maintained under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq., and (c) that the court had no jurisdiction over the matter either under the

---

3. A similar claim, advanced by a federal non-probationary employee under the Lloyd-La-Follette Act, 5 U.S.C. § 7501, not applicable to the employee here, was rejected by the Supreme Court in Arnett v. Kennedy, 1974, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15.

Administrative Procedure Act, 5 U.S.C. § 701 et seq., or 42 U.S.C. § 1983.

## II.

*Jurisdiction under the Tucker Act.*

In 1970, Congress amended the Tucker Act, 28 U.S.C. § 1346(a), to provide, in pertinent part:

"(a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:

. . . . . .

(2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidation or unliquidated damages in cases not sounding in tort. *For the purposes of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.*" (Matter added by 1970 amendments italicized.)

A similar amendment was made to 28 U.S.C. § 1491, the general jurisdictional grant to the Court of Claims. The legislative history indicates that these amendments were intended to fill a gap in the Tucker Act's waiver of immunity of the United States to claims based upon contracts with certain nonappropriated fund instrumentalities of the United States, which were regarded as "anamol[ies] of the law." 1970 U.S. Code Cong. & Admin.News p. 3478. Unfortunately, the history does not reveal the precise nature and extent of the loophole. The scope of the bill was narrowed considerably before passage, from coverage of any "nonappropriated fund activity of or under the United States or a department or agency of the United States" in an early version to the specifically enumerated instrumentalities under the aegis of the Defense Department or the National Aeronautics and Space Administration set forth in the amendments finally enacted, as quoted above. This constriction of scope reflected the traditional caution of Congress in waivers of sovereign immunity, coupled with a belief that the waiver in question should affect only instrumentalities that were capable of reimbursing the United States for money judgments incurred on their account and " 'subject to control by the responsible officials of the Government' " S.Rep.No.268 on S.980, 91st Cong., 1st Sess. (1969) at 5.

A parallel concern with defining the sort of "contract" that would be involved in the suits permitted by the amendments is, however, absent. There are scattered references in the House and Senate Reports and the appended documents submitted by interested federal agencies to "procurement activities," "contractors," "contracts with third parties," and so forth. Similarly, there are passing references to employees of these instrumentalities, in such contexts as the assertion that "employees' associations organized by employees for their benefit" under state law are not nonappropriated fund instrumentalities of the United States, S.Rep.No.268 on S.980, 91st Cong., 1st Sess. (1969), at 9, or the mention of the liability the United States presumably has under the Federal Tort Claims Act for torts committed by employees of nonappropriated fund instrumentalities acting in the scope of their employment, *id.* at 2. Nowhere in the history of the amendments is there any direct reference to the relationship between the instrumentalities and their employees, much less any language that would support an inference that Congress intended these amendments as a vehicle for redressing grievances of employees of these instrumentalities as well as settling claims of third parties with whom the instrumentalities contract for goods and services.

Nor is this all. This history of the statute itself is as relevant to our inquiry here as the history of its 1970

amendments. Prior to 1964, it provided (28 U.S.C. § 1346(d)(2)).

> (d) The district courts shall not have jurisdiction under this section of:
>
> . . . . . .
>
> (2) Any civil action or claim to recover fees, salary, or compensation for official services of officers or employees of the United States.

In 1964 subsection (2) was deleted. The negative pregnant is that the Tucker Act now provided a forum for such actions, but this conclusion finds scant support in the legislative history of the 1964 amendment. The Senate report noted (1964 U.S.Code Cong. & Admin. News p. 3255):

> "By virtue of the act of October 5, 1962 [28 U.S.C. § 1361], it is now possible for Government emloyees who allege they have been improperly discharged to sue in their home districts for reinstatement, but under the prohibition of subsection (d) of 28 U.S.C. section 1346, the employee's claim for back pay, which very frequently accompanies his claim for reinstatement, must be brought in the Court of Claims. Under these circumstances it is clear, that in order to do complete justice as efficiently and inexpensively as possible, the district courts should be given jurisdiction of the compensation claimed as well as the improper discharge, in order that they may be disposed of in a single action."

The 1964 amendment of—or, more accurately, deletion of language from—28 U.S.C. § 1346 thus must be read together with 28 U.S.C. § 1361, which provides:

> "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

The purpose of the 1964 amendment was to remove the bar of 28 U.S.C. § 1346 to monetary relief ancillary to relief that could be granted under 28 U.S.C. § 1361; the simple fact that the prohibition was deleted from 28 U.S.C. § 1346 does not in itself create new substantive rights in federal employees as against the United States, but indicates, rather, that the jurisdiction of the federal district courts is now fully concurrent with that of the Court of Claims to vindicate whatever rights they may otherwise have.

Moreover, Congress has on several occasions enacted legislation which deals with employees of the instrumentalities involved in this case in very direct and specific terms. Notably, Congress has provided in 5 U.S.C. § 2105(c) that:

> "An employee paid from nonappropriated funds of the Army and Air Force Exchange Service . . . is deemed not an employee [of the United States] for the purpose of—
>
> (1) laws (other than subchapter IV of chapter 53 [dealing with the prevailing rate system] and sections 5550 [also dealing with that system] and 7154 [prohibiting, in certain contexts, discrimination based on race, color, creed, sex, or marital status] of this title) administered by the Civil Service Commission; or
>
> (2) subchapter I of chapter 81 [dealing with compensation for work-related injuries] and section 7902 of this title [federal safety programs].

This subsection does not affect the status of these nonappropriated fund activities as Federal instrumentalities."

 In this provision, Congress has, among other things, withdrawn from employees of the instrumentalities in question the protection[4] of the Lloyd-

---

4. That the Act provides much protection to federal employees has been seriously questioned in a recent study commissioned for the Administrative Conference of the United States, and reprinted as Merrill, Procedures for Adverse Actions Against Federal Employees, 59 Va.L.Rev. 196 (1973). See also Arnett v. Kennedy, 1974, 416 U.S. 134, 206,

LaFollette Act, 5 U.S.C. § 7501, which provides that "[a]n individual in the competitive service may be removed or suspended without pay only for such cause as will promote the efficiency of the service." In addition, Congress has specifically made the provisions of the Longshoreman's and Harbor Worker's Compensation Act applicable to certain classes of Exchange Service employees, 5 U.S.C. § 8171. Congress has specifically defined employment for purposes of the Social Security Act so as to include Exchange Service employees within the ambit of that Act, 42 U.S.C. § 410(a)(6)(B)(iv). It has made Exchange Service employees eligible for unemployment compensation benefits, 5 U.S.C. § 8501. Congress has applied the minimum wage and overtime provisions to Exchange Service employees, 29 U.S.C. § 201. In construing the 1970

amendments to the Tucker Act, we cannot ignore the fact that, in the much larger statutory scheme embracing federal employment, Congress has, when it has thought such action appropriate, dealt with Exchange Service employees directly and specifically. In our view, this circumstance, coupled with the dearth of concern with employment relationships in the legislative history of the 1970 amendments, strengthens our conclusion that those amendments were not intended to extend Tucker Act jurisdiction to the sort of "contract" plaintiff asserts existed in this case.[5] Accordingly, we need not consider the Government's further argument that the plaintiff's contract was one "implied in law" rather than in fact, and that, for that reason, it was outside the scope of the Tucker Act in any event.

94 S.Ct. 1633, 1670, 40 L.Ed.2d 15, 63 (Mr. Justice Marshall, dissenting). Useful background material on the problems attending "adverse actions" taken against federal employees may be found in Johnson & Stoll, Judicial Review of Federal Employee Dismissals and Other Adverse Actions, 57 Cornell L.Rev. 178 (1971); Byse & Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv. L.Rev. 308, 343–44 (1967); Heise, Civil Pay Cases Before the Court of Claims, 55 Georgetown L.J. 497 (1966); Chaturvedi, Legal Protection Available to Federal Employees Against Wrongful Dismissal, 63 Northwestern U.L.Rev. 287 (1968); Berzak, Rights Accorded Federal Employees Against Whom Adverse Personnel Actions Are Taken, 47 Notre Dame Law. 853 (1972); Note, Dismissal of Federal Employees—The Emerging Judicial Role, 66 Colum.L.Rev. 719 (1966).

5. We are aware that the Court of Claims has recently reached the merits in a similar case—or, more accurately, has noted that "since it is clear that plaintiff has no case on the merits we defer decision of this difficult jurisdictional question." Travis v. United States, 1972, 199 Ct.Cl. 67, 70 n. 1, citing Judge Davis's note in Monett v. United States, 1969, 419 F.2d 434, 190 Ct.Cl. 1, 5 n. 4:

This is one of those cases in which it is easier for the court to decide the merits than jurisdiction. Cf. Brooks v. Dewar,

313 U.S. 354, 359–360 [61 S.Ct. 979, 85 L.Ed. 1399] (1941).

It is impracticable or at least difficult to separate out from the merits the issues that we would have to decide in order to determine whether we have jurisdiction, assuming it turns on whether plaintiff makes a substantial claim of a violation of his constitutional rights. Of course it would have to be done if we contemplated a decision the other way.

Whatever the merits of this approach, we think the Travis case is inapposite to the problem we have here, because the question of jurisdiction is the only one squarely raised, and there is little in the record before us bearing on the merits of the plaintiff's discharge.

We also realize that one case, Keetz v. United States, 1964, 168 Ct.Cl. 205, cited in the legislative history of the 1970 amendments to the Tucker Act, presented a factual context involving a discharged Exchange Service employee similar to that presented in this case; all the other cases cited in the legislative history, however, dealt with independent suppliers of goods and services, not employees, and, in light of the fact that these cases were cited as instances where sovereign immunity had been held to bar suits, and were not discussed on their facts either in the debates or the reports and other documents accompanying the proposed amendments, we think the mere fact that Keetz was cited is not enough to defeat our conclusion.

## III.

### *Jurisdiction under the Federal Tort Claims Act.*

 The plaintiff's attempt to characterize his factual allegations so that they would be cognizable under the Federal Tort Claims Act must fail. In Blanchard v. St. Paul Fire & Marine Ins. Co., 5 Cir. 1965, 341 F.2d 351, 357–358, we stated:

The gravamen of Blanchard's complaint is that "the United States Government through its agents, servants and employees wrongfully interfered with the performance of * * * [his] contract" with the United States by "hampering" him . . . from completing the work undertaken.

. . . . . .

The Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq., was designed, with certain exceptions, to "remove the sovereign immunity of the United States from suits in tort. * * * . . . . Uppermost in the mind of Congress when it waived this immunity were the ordinary common law torts. . . .

That claims based upon breach of contract are wholly alien to the Tort Claims Act is beyond question. [Citation omitted.]

The principle underlying *Blanchard* applies with equal force to employment relationships between the United States and its instrumentalities, and individuals employed by them such as the plaintiff here.

The present case makes all too evident the prevalence—and unreliability—of the labels parties often seek to impose upon the relationships between agencies and instrumentalities of government and their employees. Those relationships are primarily functions of statutes and regulations, and not creatures of the common law (federal or otherwise) of contract or tort. We do not mean to imply that a cause of action under the Tort Claims Act can never arise out of a federal employment relationship. We simply say that, on the basis of the record before us, the plaintiff's claims seem to rest on the asserted failure of the Exchange Service to comply fully with its own procedures, the alleged bias that infected the decisionmaker, and certain defects in the prescribed procedures that in themselves constituted a denial of due process. They do not, therefore, fall within the language of the Tort Claims Act extending jurisdiction over claims "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment". 28 U.S.C. § 1346(b).

## IV.

### *Jurisdiction under the Veterans' Preference Act of 1944.*

 The plaintiff contends that, as a veteran, he is protected against adverse action other than action taken for "such cause as will promote the efficiency of the service" under the Veterans' Preference Act, 5 U.S.C. §§ 7511, 7512. Because these provisions are administered by the Civil Service Commission, see 5 U.S.C. §§ 3318, 7701, and because 5 U.S.C. § 2105(c)(1), set forth in Part II of this opinion, provides that employees of the Exchange Service are to be deemed not employees of the United States, with some exceptions, for purposes of statutes administered by the Commission, we conclude that these provisions are inapplicable to the plaintiff.

## V.

### *Jurisdiction under the Administrative Procedure Act.*

 The action of the Exchange Service in effecting the plaintiff's discharge is reviewable under the Administrative Procedure Act, 5 U.S.C. § 701 et seq.

 There can be no doubt that the plaintiff had an interest in continuation in his position as architect sufficient to require the procedural due proc-

ess guaranteed by the Fifth Amendment. It is true that the employment relationship of the plaintiff here, unlike that of the federal nonprobationary employee involved in the recent case of Arnett v. Kennedy, 1974, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15, is not governed by terms and conditions of employment which flow from a discrete federal statutory provision. But interests protected by the Fifth Amendment need not be, and in fact often are not, grounded in federal statutory law. In his analysis of the source of the right entitled to the due process guarantee of the Fifth Amendment in *Arnett*, Mr. Justice Rehnquist (with whom the Chief Justice and Mr. Justice Stewart joined), relied upon this statement in Mr. Justice Stewart's opinion for the Court in Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561:

> Property interests, of course, are not created by the Constitution.

Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law —rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

Mr. Justice Rehnquist viewed the federal nonprobationary employee's right to due process in *Arnett* in an action taken against him by the Office of Economic Opportunity to terminate his employment with that agency as stemming primarily from the Lloyd-LaFollette Act, 5 U.S.C. § 7501.[6]

In the case before us, the nature of the relationship between the Exchange Service and its employees is governed primarily by a detailed set of Army and Air Force Regulations, AR 60–21/AFR 147–15, "Exchange Service Personnel Policies," promulgated by the Departments of the Army and the Air Force,

---

**6.** Mr. Justice Rehnquist noted that "[h]ere appellee did have a statutory expectancy that he not be removed other than for 'such cause as will promote the efficiency of the service.' But the very section of the statute which granted him that right, a right which had previously existed only by virtue of administrative regulation, expressly provided also for the procedure by which 'cause' was to be determined, and expressly omitted the procedural guarantees which appellee insists are mandated by the Constitution." Mr. Justice Powell, with whom Mr. Justice Blackmun joined, concurring in part in the result, agreed that "the federal statute guaranteeing appellee continued employment absent 'cause' for discharge conferred on him a legitimate claim of entitlement which constituted a 'property' interest under the Fifth Amendment." Mr. Justice Powell disagreed, however, with respect to the test to be applied to the procedures established by the statute:

> The plurality would thus conclude that the statute governing federal employment determines not only the nature of appellee's property interest, but also the extent of the procedural protections to which he may lay claim. It seems to me that this approach is incompatible with the principles laid down in Roth and [Perry v.] Sindermann [408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)]. Indeed, it would lead directly to the conclusion that what-

ever the nature of an individual's statutorily-created property interest, deprivation of that interest could be accomplished without notice or a hearing at any time. This view misconceives the origin of the right to procedural due process. That right is conferred not by legislative grace but by constitutional guarantee. While the legislature may elect not to confer a property interest in federal employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards.

Arnett v. Kennedy, 1974, 416 U.S. at 166, 94 S.Ct. at 1650, 40 L.Ed.2d at 40–41.

Mr. Justice White, concurring in part and dissenting in part, shared these misgivings. He took it as a fundamental proposition that "where there is a legitimate entitlement to a job, as when a person is given employment subject to his meeting certain specific conditions, due process requires, in order to insure against arbitrariness by the State in the administration of its law, that a person be given notice and a hearing before he is finally discharged. . . . The fact that the origins of the property right are with the State [rather than in federal statutory law, for example] makes no difference for the nature of the procedures required." Arnett v. Kennedy, 1974, 416 U.S. at 185, 94 S.Ct. at 1659, 40 L.Ed.2d at 51.

March 6, 1969, and effective when the events occurred that culminated in the plaintiff's discharge. The provisions of these regulations which bear most directly on the plaintiff's contentions in this case are set forth in Chapter 3 of AR 60–21/AFR 147–15, "Personnel Relations". Section 3–7 provides that an employee may be separated (discharged) for "gross inefficiency" "only when the employee has, in the course of his employment, acted or failed to act with such utter indifference that the foreseeable and natural consequences seriously and adversely affect AAFES." Section 3–8 provides that an employee may be separated for "conduct on the job involving insubordination, violation of laws, regulations, rules or procedures, or other conduct incompatible with maximum employee efficiency," or "conduct off the job reflecting substantial discredit on AAFES," and then only when counseling or lesser disciplinary measures "are determined to be inappropriate" or "have been utilized without apparent success," and "the act or conduct is of such a major nature, or so reprehensible or so repetitious that retention of the employee in any capacity is determined to be incompatible with the best interests of AAFES." Section 3–10 provides that employees may be separated for "unsatisfactory performance". A finding of "unsatisfactory performance" may be made in response to an employee's failure to remedy "performance deficiencies" that are "of a significant or material nature" and that have been the subject of previous counseling with his superiors and of a "warning letter" addressed to him and specifically apprising him of the "deficiencies". Under section 3–13, an employee may be separated for "disqualification," in the sense of failure to qualify for a fidelity bond, failure to make a required affidavit or submit a "security questionnaire," or failure to qualify for a "security clearance". Section 3–14 provides that a probationary employee may be separated simply upon a determination that continued employment "is not in the best interests of AAFES". Section 3–15 provides for separation in the cases of employees "whose physical or mental condition renders them incapable of performing the duties of their assigned positions for an indefinite period of time". Other sections of Chapter 3 provide for separations "for reduction in force," (section 3–16), "because of death," (section 3–17), "upon expiration of the agreed period," (section 3–18), "separation from on-call employment," (section 3–19), "separation based upon resignation," (section 3–20), separation based upon "declination of transfer" (section 3–21), separation because of maternity (section 3–22), and separation for retirement (sections 3–24 and 3–25).

Read together, these safeguards and standards establish protections against arbitrary dismissal. The plaintiff's interest in continuation in his position with the Exchange Service is characterized by those same "attributes of 'property' interests protected by procedural due process" described in Mr. Justice Stewart's opinion for the Court in Board of Regents v. Roth, 1972, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

The plaintiff's interest in continued employment in this case is well within the parameters defining property interests protected by the Fifth and Fourteenth Amendments in such recent cases as Goldberg v. Kelly, 1970, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (termination of welfare benefits); Morrissey v. Brewer, 1972, 408 U.S. 471, 92 S.Ct.

2593, 33 L.Ed.2d 484 (parole revocation); Bell v. Burson, 1971, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (revocation of driver's license); Sniadach v. Family Finance Corp., 1969, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (garnishment of wages).

The fact that Congress has provided that Exchange Service employees are to be included within the coverage of certain statutory provisions affecting federal employees generally and excluded from others, among them the Lloyd-LaFollette Act, 5 U.S.C. § 7501, construed in *Arnett,* does not alter this conclusion. If anything, the plaintiff here has more of a claim of entitlement to continuation in his employment than the plaintiff in *Arnett,* because the Army and Air Force regulations summarized above provide standards for effecting separations which are more rigorous and more fully articulated than those contained in the Lloyd-LaFollette Act. Though the source of the power to promulgate these regulations which define the employment relationship is executive in nature and therefore different from the statutory nature of the standard involved in *Arnett,* this circumstance does not alter our conclusion that the relationship in fact established under those regulations is subject to the protection of the Due Process Clause of the Fifth Amendment. As Mr. Justice Black reasoned in holding that the Exchange Service, though itself a creature of regulations, was to be regarded as an integral part of the War Department and therefore entitled to all its immunities, "[t]hat the establishment and control of post exchanges have been in accordance with regulations rather than specific statutory directions does not alter their status, for authorized War Department regulations have the force of law." Standard Oil Co. of California v. Johnson, 1942, 316 U.S. 481, 484, 62 S.Ct. 1168, 1169, 86 L.Ed. 1611, 1615. (citations omitted).

■ Where there is a right, so must there be a remedy as well. The plaintiff may vindicate his right to procedural due process by bringing an action under the provisions of the Administrative Procedure Act relating to judicial review, 5 U.S.C. §§ 701–706.[7] The Government has contended in this Court and the court below that a suit like this is precluded under the Administrative Procedure Act by those portions of 5 U.S.C. §§ 553 (rule making) and 554 (adjudications) which except from their provisions "a matter relating to agency management or personnel" in the case of rule making and a matter involving "the selection and tenure of an employee" in every case of adjudications. This contention cannot be sustained. These exclusions have nothing to do with those sections of the Administrative Procedure Act dealing with judicial review of agency action, 5 U.S.C. §§ 701–706. Quite to the contrary of the Government's position in this case, the courts increasingly over the past fifteen years have entertained actions to review the discharge of, or other adverse action taken against, federal employees. Professor Davis has noted in the 1970 Supplement to his Administrative Law Treatise:

> During the 1960's, the courts have uniformly been willing to review employee dismissal cases for (a) lack of

---

7. These provisions apply to the Exchange Service, because it has not been excluded from the otherwise comprehensive definition of an "agency" for purposes of judicial review contained in 5 U.S.C. § 701, which provides that " 'agency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency."

This is not to imply that the plaintiff might not also have access to the courts by way of section 1361 of the Mandamus and Venue Act of 1962, 28 U.S.C. § 1361, a contention not present in this case. *See generally* Byse & Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv.L.Rev. 308, 342–44 (1967). *See also* Charlton v. United States, 3 Cir. 1969, 412 F.2d 390, 396 (Stahl, J., concurring) (collecting cases).

statutory authority, (b) unfair procedure, and (c) arbitrary or capricious action or abuse of discretion. The problem about which the law has been confused during the 1960's is whether or not the courts will review evidence to determine whether findings are supported by substantial evidence.

K. Davis, Administrative Law Treatise § 29.07, at 1109 (Supp.1970). *See also* Polcover v. Secretary of the Treasury, 1973, 155 U.S.App.D.C. 338, 477 F.2d 1223, 1225–1228. And it should be noted that this judicial scrutiny under the Administrative Procedure Act has been exercised in the area of federal employment despite the provision in 5 U.S.C. § 701(a)(2), which makes the judicial review provisions inapplicable to the extent that "agency action is committed to agency discretion by law." *See, e. g.,* Charlton v. United States, 3 Cir. 1969, 412 F.2d 390; Norton v. Macy, 1969, 135 U.S.App.D.C. 214, 417 F.2d 1161; Jaeger v. Stephens, D.Colo., 1971, 346 F.Supp. 1217; Mindel v. United States Civil Service Commission, N.D.Cal.1970, 312 F.Supp. 485. *See also* Saferstein, Nonreviewability: A Functional Analysis of "Committed to Agency Discretion," 82 Harv.L.Rev. 367 (1968).

█ Because we have concluded that the plaintiff had an interest in his employment relationship protected by the Fifth Amendment, it follows, for purposes of determining whether the district court had jurisdiction, at least, that the plaintiff is "a person suffering legal wrong because of agency action" under 5 U.S.C. § 702. Accepting, as we must for the limited purpose of this appeal, the truth of the uncontested allegations of his complaint, we think they are sufficient to constitute a denial of due process under the Fifth Amendment. The plaintiff alleges, in effect, that the prescribed procedures were not fully complied with, that bias infected the decisionmaker, and that the discharge was not supported by substantial evidence but rather was of an arbitrary and capricious character. On these allegations, the plaintiff is entitled to judicial review of the administrative action whereby his separation was effected.

The fifth count of the complaint also alleges a number of constitutional defects in the procedures prescribed by the regulations under which discharges are effected and reviewed within the Exchange Service. In light of the action we take with respect to the plaintiff's other contentions, and with due regard for the lack of an adequate record at this stage of the proceedings and for the fact that these constitutional issues were neither argued nor briefed in the court below or in this Court, we decline to pass upon them at this time.

On remand, the district court will determine whether there has been compliance with the procedures for effecting and reviewing separations from the Exchange Service established in AR 60–21/AFR 147–15 of March 6, 1969, and, in accordance with the provisions of 5 U.S.C. § 706,[8] whether there was suffi-

---

8. 5 U.S.C. § 706 provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) Compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute;

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

cient evidence to support the discharge. In determining what remedies, if any, are appropriate, the district court will have due regard for the Army and Air Force regulation currently in force, AR 60–21/AFR 147–15, "Exchange Service Personnel Policies," promulgated April 23, 1973, Ch. 1, Section 1–8(k), which "authorizes payment of back pay, allowances or differentials, as applicable, for employees [of the Exchange Service] who have undergone unjustified or unwarranted personnel actions, less any amounts earned by the employee during the applicable period," in accordance with the principles applicable to federal employees generally under 5 U.S.C. § 5596.

For the reasons stated, the judgment of the United States District Court for the Northern District of Texas is affirmed in part, and reversed in part, and the cause is remanded to that court for further proceedings consistent with the views expressed here.

Affirmed in part, reversed in part, and remanded.